Approved: *D M*
DINA MCLEOD
Assistant United States Attorney

Before: THE HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge
Southern District of New York

16 MAG 7321

U.S. DISTRICT COURT FILED
NOV 15 2016
S.D. OF N.Y.

DOC #_____

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :
                                  :   **SEALED COMPLAINT**
                                  :
      - v. -                      :   Violations of
                                  :   21 U.S.C. §§ 812,
                                  :   813, 841(a)(1),
ANDREW COOK,                      :   841(b)(1)(C), 802(32)(A)
                                  :   and 18 U.S.C. § 2.
                                  :
                                  :
              Defendant.          :
                                  :   COUNTY OF OFFENSE:
- - - - - - - - - - - - - - - - - x   NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

CHRISTOPHER REDDINGTON, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA") and charges as follows:

### COUNT ONE

1. From at least in or about January 2016 to on or about April 10, 2016, in the Southern District of New York and elsewhere, ANDREW COOK, the defendant, intentionally and knowingly did distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

2. The controlled substance involved in the offense was mixtures and substances containing a detectable amount of methoxetamine hydrochloride (MXE), which is a controlled substance analogue of N-ethyl-1-phenylcyclohexylamine (PCE), as defined in 21 U.S.C. § 802(32), that was intended for human

consumption and is treated as a controlled substance in schedule I, in violation of 21 U.S.C. §§ 813 and 841(b)(1)(C).

(Title 21, United States Code, Sections 812, 813, 841(a)(1), 841(b)(1)(C), 802(32)(A) and Title 18, United States Code, Section 2.)

The bases for my knowledge of the foregoing charge are, in part, as follows:

3. I have been a DEA Special Agent for over 8 years. I have been assigned to the DEA's Tactical Diversion Squad for approximately 7 months. I have been personally involved in the investigation of this matter. This affidavit is based upon my conversations with law enforcement agents and others, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Background on Methoxetamine (MXE)

4. Based on my training and experience and my discussion with a DEA chemist, I have learned the following:

a. Methoxetamine (MXE) shares a substantially similar chemical structure with the hallucinogen, N-ethyl-1-phenylcyclohexylamine (PCE).

b. PCE is a Schedule I controlled substance.

5. Based on my discussion with a DEA pharmacologist, I have learned the following:

a. MXE is a designer drug that belongs to the arylcyclohexylamine class of drugs. Phencyclidine (PCP), ketamine, and PCE are also arylcyclohexylamines.

b. Many substances in the arylcyclohexylamine class of drugs produce dissociative anesthetic and hallucinogenic effects.

c. Based on studies relating to arylcyclohexylamines, and case reports relating to the human consumption of MXE and PCE, MXE is believed to produce

hallucinogenic effects substantially similar to those produced by PCE.

### Discovery of COOK's Drug Manufacturing Premises

6. From my conversations with law enforcement agents with the Long Branch, New Jersey Police Department ("Long Branch PD") and reviewing documents maintained by the Long Branch PD as part of this investigation, I have learned the following, in substance and in part:

    a. On or about April 10, 2016, a police officer ("PO-1") with the Long Branch PD responded to a residence in the vicinity of 505 Long Branch Avenue ("COOK Residence") where an individual was reportedly having a seizure.[1]

    b. Upon arrival, PO-1 encountered a man ("UM-1") who informed PO-1 that his friend was having a seizure. PO-1 went into the bathroom and observed another male individual, later identified as ANDREW COOK, the defendant, on the floor of the bathroom.

    c. Medical responders arrived at the COOK Residence and administered medical aid to COOK.

    d. UM-1 advised PO-1 that COOK's bedroom was located upstairs, and PO-1 proceeded to COOK's bedroom in an attempt to locate any medications that might have caused COOK's condition.

    e. As PO-1 exited COOK's bedroom, PO-1 noticed an adjacent room with an open door. Through the open door, in plain view, PO-1 observed a large container underneath a lamp that appeared to contain a quantity of a powdery, rock-like substance. Based on PO-1's training and experience, PO-1 believed the substance to be a controlled substance and the setup of the substance under the lamp to be consistent with the production of a controlled substance.

    f. COOK was transported to a nearby hospital.

### Search of the COOK Residence

7. From my conversations with law enforcement agents with the Long Branch, New Jersey Police Department ("Long Branch

---

[1] Based on my review of the lease for the COOK Residence, I have learned that the COOK Residence was leased in the name of ANDREW COOK, the defendant, and COOK's mother.

       benzodiazepines to be diluted in propylene glycol;[3]

     ix. Various plastic tubs containing plastic bottles with clear fluid, labeled as analogues of various benzodiazepines.

  8. Based on my review of DEA laboratory analysis, I know that approximately 395 grams of MXE was recovered from the COOK Residence.

  9. Based on my review of the invoices seized from the COOK Residence, I have learned the following, in substance and in part:

   a. ANDREW COOK, the defendant, has been shipping various drugs, including MXE, to individuals across the country, using the company name DLL Co. or Downlow Labs.

   b. For example, one invoice dated April 3, 2016 recorded the shipment and sale of 5 grams of "A- Grade MXE 1g+" for approximately $381.00 to an individual with an address in New York, New York (the "Manhattan Address").

  10. On or about July 15, 2016, law enforcement agents obtained a search warrant from a New Jersey Superior Court judge to search various electronic devices seized from the COOK Residence, including three thumbdrives ("Thumbdrive-1," "Thumbdrive-2," and "Thumbdrive-3") and a laptop (the "COOK Laptop"). From my review of the contents of "Thumbdrive-1," "Thumbdrive-2," and "Thumbdrive-3," I have learned the following, in substance and in part:

   a. Thumbdrive-1 contains a sheet of printable labels which read, in part, "Methoxetamine (R/S)-2-(3-Methoxyphenyl)-ethylamino)cyclohexanone" and includes what appears to be a picture of the MXE molecule. Based on my conversation with a DEA chemist, I have learned that those labels contain an accurate chemical description and picture of the MXE molecule.

---

[3] Benzodiazepines are a class of psychoactive drugs. The anti-anxiety drug alprazolam, often sold under the brand name "Xanax," is one example of a benzodiazepine.

    b. Thumbdrive-2 contains a sheet of printable labels which read: "Methoxetamine  QTY:   -For GC/MS Only- -Not for Human Consumption-."

    c. Thumbdrive-2 also contains a "Merchant Pre-Approval Form" which identified ANDREW COOK, the defendant, as the sole owner of DLL Co. Under the heading "Detailed description of products/services sold," the following text had been input into the form: "We provide research materials that are all legal under all 50 states, and do not fall under the Federal Analog Act."

    d. Thumbdrive-3 contained a Word document with various links to a website, including the link to the Downlow Labs website's "managewebsiteportal."

   11. Based on my review of documents found on the COOK Laptop, I believe that COOK was selling MXE for human consumption. Based on my review of these documents, I have learned the following, in substance and in part:

    a. The COOK Laptop contained a document with printable United States Postal Service shipping labels, including at least one shipping label with the Manhattan Address.

    b. The COOK Laptop contained a Word document labeled "MXM review" ("Document-1"). Document-1 appeared to contain a "review" of the effects of consuming methoxmetamine or "MXM."

    c. Based on my conversation with a DEA chemist, I know that MXM and MXE are closely related drugs and that both are in the phencyclidine drug class.

    d. Throughout Document-1, the effects of MXM upon human consumption were discussed and compared with MXE.

    e. For example, the text in Document-1 claimed that a "senior analyst" at the "lab" had been accidentally "stuck in his quadriceps by a needle and syringe containing 120 mg of the Methoxmetamine solution."

    f. Document-1 continued: "He relayed to us the nature of his experience, and we observed while monitoring vitals (he is experienced with its parent chemical, Ketamine); there was significant sedation and delayed motor response for a period of about 2.5 hours. His heart rate and blood pressure increased mildly. Despite the anaesthesia, when asked how he was doing, our

colleague remained relatively lucid. Every other indication of NMDA antagonist action was present and there were few surprises on our end. The subject relayed to us the details of his experience as best he could:

- Heavy dissociation and decreased perception of tactile input.
- Very immersive physically and visually, on par experientially with Ketamine in this respect.
- Music euphoria was prevalent, and 'shaped the experience'
- Time dilation was extreme, and the couple hours felt much longer subjectively."

        g.    The last sentence of Document-1 reads, "I, at least personally, prefer it to MXE."

        h.    The COOK Laptop also contained a document entitled "Welcome Home," which appeared to be a letter from ANDREW COOK, the defendant, to the customers of Downlow Labs ("Document-2") explaining his "sudden disappearance."

        i.    Document-2 states, in part: "The next subject that must be addressed is the ever so popular suggestion upon a vendors disappearance is the old 'compromised by LEO [law enforcement officers].' I find this to be somewhat easy to reassure everyone about. The chemicals that were available for sale were and still are LEGAL at the Federal Level. As per the Terms & Conditions have always stated; these products are NOT FOR HUMAN CONSUMPTION. Of the chemicals sold, all were Schedule 3, 4, 5 analogs, not falling under the FAA, making them legal by default. For those that may have distantly applied to the FAA (i.e. MXE to PCE [Sched 1.]) there would be no basis because the chemical in question was not sold for consumption nor utilized for consumption. Any purchases outside those guidelines were not (and wont be) permitted. That being said, I am also guilty of having anxiety in the past regarding LEO when vendors went cold, so I do understand it. Granted, as a community we have only seen domestic vendors taken down/investigated that were supplying highly dangerous chemicals that could be fatal if handled improperly ( ie pyvalerone, fent, lsx analogs )."

        12.    Based on my interview of a customer of Downlow Labs ("Customer-1"), I have learned the following, in substance and in part:

        a.    Customer-1 purchased MXE from Downlowlabs.com.

    b. MXE was shipped to Customer-1 in powder form, in a U.S. Postal Service envelope.

    c. Customer-1 paid Downlow Labs for the MXE using Bitcoin, an anonymous digital currency.

    d. According to Customer-1, MXE is understood to be a recreational drug and can be consumed in a variety of ways, including snorting and swallowing the drug.

    e. Customer-1 purchased MXE from Downlow Labs for personal consumption.

PD") and the New Jersey State Police and reviewing documents maintained by the Long Branch PD and the New Jersey State Police as part of this investigation, I have learned the following, in substance and in part:

    a. On or about April 10, 2016, law enforcement agents with the Long Branch PD obtained a search warrant for the COOK Residence from a New Jersey Superior Court judge.

    b. During the search, law enforcement agents discovered a drug manufacturing facility in a room on the second floor of the COOK Residence.

    c. In that room, agents discovered, among other things, the following:

        i. Numerous plastic baggies labeled "methoxetamine" containing an off-white powder;

        ii. Pipettes, masks, rubber gloves, beakers, digital scales, funnels, and other laboratory equipment;

        iii. A pill press;

        iv. Hundreds of invoices;

        v. Shipping supplies, including United States Postal Service Priority Mail boxes, padded envelopes, empty ziplock bags labeled "methoxetamine;"

        vi. A cardboard box containing several large bags of blue, white, and yellow powder, labeled "cellulose;"[2]

        vii. Approximately $14,500 in cash, packaged in vacuum-sealed bags;

        viii. A handwritten note with calculations for the dilution factors for various

---

[2] The powder field-tested positive for cellulose, a commonly-used binding agent in pill manufacturing.

WHEREFORE, the deponent respectfully requests that a warrant issue for the arrest of ANDREW COOK, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

_____
CHRISTOPHER REDDINGTON
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me this
15th day of November, 2016

_____
THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK